ILLINOIS NATIONAL
GUARD, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

National Federation of Federal
Employees, Intervenor.

WYOMING AIR NATIONAL GUARD
and Department of Defense,
Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

CALIFORNIA NATIONAL GUARD and
Department of Defense, Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

Nos. 87–1290, 87–1345 and 87–1346.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1988.

Decided Aug. 19, 1988.

As Amended Sept. 6, 1988.

Joseph R. Reyna, Atty., Nat. Guard Bureau, with whom John R. Bolton, Asst. Atty. Gen., Richard K. Willard, Asst. Atty. Gen.*, William Kanter, Sandra Wien Simon, Attys., Dept. of Justice and James C. Hise, Atty., Nat. Guard Bureau, Washington, D.C., were on the brief, for petitioners/cross respondents.

\* At time initial brief was filed.

James F. Blandford, Atty., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., William E. Persina, Deputy Sol. and Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent/cross-petitioner. Susan Berk, Atty., Federal Labor Relations Authority, Washington, D.C., also entered an appearance for respondent/cross-petitioner.

H. Stephen Gordon and Bruce P. Heppen were on the brief for intervenor, Nat. Federation of Federal Employees. Alice L. Bodley, Washington, D.C., also entered an appearance for intervenor, Nat. Federation of Federal Employees.

Before RUTH BADER GINSBURG, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Federal Labor Relations Authority (FLRA) held that, under the Federal Employees Federal and Compressed Work Schedules Act of 1982 (Schedules Act), the National Guards of three states must bargain with certain of their full-time employees over the establishment of compressed work schedules. The Guards, joined by the Department of Defense, petition for review, arguing that the National Guard Technician Act (Technician Act) exempts them from the bargaining requirements of the Schedules Act; the FLRA cross-petitions to enforce its orders. We conclude that Congress intended for the Technician Act, rather than the Schedules Act, to control in this situation, and hence we grant the petitions for review and deny the FLRA's cross-petitions for enforcement.

## I. BACKGROUND

### A. *The National Guard*

The National Guard is the modern Militia reserved to the states by Art. I § 8, cl. 15, 16 of the Constitution. *Maryland v. Unit-*

*ed States,* 381 U.S. 41, 46, 85 S.Ct. 1293, 1297, 14 L.Ed.2d 205 (1965). It occupies a unique position in our country's federal structure: the day-to-day operation of National Guard units remains under the control of the states, but since passage of the National Defense Act of 1916, 39 Stat. 166, the Guard has been armed and funded by the federal government, and trained in accordance with federal standards. Pursuant to the 1916 law, as amended in 1933, the National Guard is also part of the United States Army Reserve, and officers of the Guard receive corresponding commissions in the Army Reserve Corps. Thus, it is "an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war," and it "also may be federalized in addition to its role under state governments, to assist in controlling civil disorders." *Gilligan v. Morgan,* 413 U.S. 1, 7, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973).

The status of National Guard employees, like that of the Guard itself, is unusual and somewhat complex. In addition to its part-time, purely military personnel, the Guard employs full-time civilian workers, known as National Guard technicians, who "meet the day-to-day administrative, training, and logistic needs of the Guard." *Simpson v. United States,* 467 F.Supp. 1122, 1124 (S.D. N.Y.1979). While many of their duties are similar to those of employees who work in a typical civilian setting, technicians traditionally have been required to be members of their state National Guard units, and must perform even their civilian tasks "in a distinctly military context, implicating significant military concerns." *New Jersey Air National Guard v. FLRA,* 677 F.2d 276, 279 (3d Cir.1982) (*"New Jersey Guard"*).

Although National Guard technicians have been paid with federal funds for over 70 years, they were not federal employees until 1968, when Congress enacted the National Guard Technician Act, Pub.L. No. 90–486, 82 Stat. 755 (codified as amended at 32 U.S.C. §§ 709, 715 (1982)). That Act grants technicians federal employee status "for the limited purpose of making fringe and retirement benefits of federal employ-

ees and coverage under the Federal Tort Claims Act ... available to National Guard technician employees of the various states." *American Federation of Government Employees Local 2953 v. FLRA,* 730 F.2d 1534, 1537 (D.C.Cir.1984). The Technician Act codifies the requirement that technicians be members of their state National Guard units and hold military grades that correspond to their civilian positions, 32 U.S.C. § 709(b) (1982), and also vests the adjutants general of the various states with final discretion over most matters relating to their employment and termination. *Id.* at § 709(e). Thus, the employment status of National Guard technicians is a hybrid, both of federal and state, and of civilian and military strains.

Because of their unique status, the Technician Act specifically exempts Guard technicians from several other provisions of title 5 of the U.S. Code that apply to the vast majority of federal government employees. For example, technicians who are fired or suspended from the Guard may not avail themselves of the appeals procedure set forth in section 7513. *Id.* at § 709(f). Nor does the veterans' preference provided for in sections 2108 and 3502 have any bearing on the selection of National Guard technicians. *Id.* Most significantly for present purposes, the Technician Act also exempts Guard technicians from the hours of work limitation of section 6101(a), and the overtime pay requirements of section 5544(a). *Id.* at § 709(g).

## B. *The Work Schedules Act*

In 1978, having found that "trends in the usage of 4–day weeks, flexible hours, and other variations in the workday and workweek in the private sector appear to show sufficient promise to warrant ... experimentation" by the federal government, Congress authorized federal agencies to experiment with flexible and compressed work schedules (referred to collectively as alternative work schedules) over a three-year period. Work Schedules Act of 1978, Pub.L. No. 95–390, 92 Stat. 755 (codified as amended at 5 U.S.C. § 6101 note (1982)). Compressed schedules usually involve a

workweek of four 10–hour days or a fortnight of eight 9–hour days and one 8–hour day. Employees with flexible schedules work five 8–hour days per week, but may stagger their arrival and departure times in order to avoid rush hour traffic or to accommodate other personal preferences.

Although Congress found, at the end of the test period, that "improper use of alternative work schedules did have some serious repercussions," including increased costs and decreased productivity, it concluded that "[t]he benefits of these schedules to employees were overwhelming," and that "[t]he benefits of these schedules to government, when utilized in a proper fashion, were also significant." S.Rep. No. 365, 97th Cong., 2d Sess. 4 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 565, 566. Accordingly, in 1982 Congress passed the Schedules Act, which extended the program, and in 1985 made it permanent. 5 U.S.C. § 6101 note (Supp. IV 1986).

The Schedules Act provides that if the employees of an agency are represented by an exclusive bargaining representative, *i.e.,* a union, then the agency must bargain with it over the establishment or the termination of any alternative work schedule. 5 U.S.C. § 6130(a) (1982). If there is no union, the agency cannot impose a compressed work schedule (although it may apparently impose a flexible schedule) without the approval of a majority of the affected employees. *Id.* at § 6127(b)(1). If the union proposes a compressed schedule that the agency believes will affect it adversely, and the parties bargain to impasse over the issue, then the dispute is referred to the Federal Service Impasses Panel (FSIP), which is required to impose the union's proposed schedule unless the agency shows that it would have an adverse impact on the agency's productivity, output, or costs. *Id.* at § 6131.

### C. *The Proceedings Below*

In 1986, during contract negotiations between the Illinois National Guard and the union representing its technicians, the union submitted a proposal that would allow the technicians, at their individual election, to work a compressed schedule of four 10–hour days a week. The Guard took the position that the proposal was non-negotiable, and the union appealed to the FLRA pursuant to section 7117 of the Federal Service Labor–Management Relations Statute (the Federal Labor Act). *See* 5 U.S.C. § 7117 (1982). Before the FLRA, the Guard argued that section 709(g) of the Technician Act, which provides that the Secretary of the Army "may prescribe the hours of duty" for technicians "notwithstanding ... any other provision of law," grants it unfettered discretion to establish their work schedules and is therefore inconsistent with the bargaining requirement of the Schedules Act. Alternatively, the Guard argued that the proposal was nonnegotiable because it would interfere with reserved management rights, and because it was inconsistent with a regulation for which the Guard has a compelling need. *See id.* at §§ 7106, 7117.

The FLRA held that the Guard was required to bargain over the proposal. It first noted that the Schedules Act defines the "employees" to which it applies by reference to the general definition of employee in section 2105 of title 5, which includes National Guard technicians. Addressing the Guard's claim that the Schedules Act and the Technician Act are inconsistent, the FLRA reasoned that even if there were a "limited conflict" between the two statutes, inasmuch as the former requires premium pay for overtime work and the latter prohibits it, the statutes were otherwise capable of being applied together. Specifically, it said that although the Technician Act gives the Guard "authority" to establish irregular work hours for technicians "notwithstanding any other provision of law," it did not give the Guard "exclusive" authority to establish their work schedules. "Thus," the FLRA concluded, "the [Guard] is not deprived of that authority by being required to exercise it through the procedures and under the limitations of the Work Schedules Act."

The FLRA also rejected the claim that the duty to bargain over work schedules could undermine the Guard's ability to per-

form its military role, complacently noting that where the Guard "demonstrates to the satisfaction of the [FSIP] that an alternate work schedule will have, or is having, an adverse impact, it will not be required to implement that schedule." Finally, the FLRA disposed of the Guard's management rights and compelling need claims under the Federal Labor Act by reference to its then-recent decision in *American Federation of Government Employees, Local 1934, and Department of the Air Force, 3415 ABG, Lowry AFB, Colorado,* 23 F.L.R.A. 872 (1986), where it held that the Schedules Act makes any proposal over an alternative work schedule "fully negotiable," subject only to an FSIP determination that it would have an adverse impact on the agency's productivity *et cetera.*

While the Illinois case was pending before the FLRA, unions negotiating with National Guard units in Wyoming and California also submitted proposals regarding compressed work schedules for technicians. In each case, the Guard refused to bargain, and the unions filed negotiability appeals to the FLRA. Relying on its decision in the Illinois case, the FLRA found the proposals in both cases to be negotiable, and ordered the Guards to bargain over them.

In each of the three cases, the Guard, joined by the United States Department of Defense, has filed petitions for review, and the FLRA has cross-filed for enforcement of its orders. The National Federation of Federal Employees intervened in the Illinois case in support of the FLRA. We consolidated the three cases for the purposes of this appeal.

## II. ANALYSIS

### A. *Standard of Review*

As we recently noted, "[u]nder the law of this circuit, when an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference." *Department of the Treasury v. FLRA,* 837 F.2d 1163, 1167 (D.C.Cir.1988); *see also, INS v. FLRA,* 709 F.2d 724, 729 n. 21 (D.C.Cir. 1983). In this case, the FLRA was called upon to resolve an apparent conflict between two statutes, the Schedules Act and the Technician Act, neither of which it is charged with administering. *Cf. Colorado Nurses Association v. FLRA,* 851 F.2d 1486, 1488 (D.C.Cir.1988) (no deference owed to FLRA's reconciliation of its organic statute with a statute not within its area of expertise); *New Jersey Guard,* 677 F.2d at 282 n. 6. ("[W]e are not obliged to defer to the FLRA's reading of the Technician Act, or to its resolution of the conflict between the [Technician Act and the Federal Labor Act]"). Therefore, while we follow the FLRA's reasoning "to the extent that we deem is sound," *Department of the Treasury,* 837 F.2d at 1167, we review the FLRA's decision in this case *de novo.*

### B. *Statutory Construction*

Our path through the statutory maze in this case is considerably easier for the footprints left by Judge Adams in the *New Jersey Guard* case. In that case, the technicians' union submitted a proposal that would have allowed aggrieved employees to challenge, in binding arbitration, disciplinary actions taken by the state adjutant general. Although the Federal Labor Act expressly provides that such a proposal is within the duty to bargain, and appears to apply by its terms to Guard technicians as employees of an "Executive agency," the New Jersey Guard declared the proposal nonnegotiable. Although the Technician Act predates the Federal Labor Act, the New Jersey National Guard took the position that it continued to commit such actions to the administratively unreviewable discretion of the state adjutant general.

The FLRA found that the two statutes involved in that case could "be harmonized if they are seen as creating alternative routes ... by which a grievant can raise his claims," 677 F.2d at 282, and ordered the Guard to bargain over the proposal. Its holding, restated in the language it has used in this case, was that although the adjutant general had "authority" to review employee grievances, he did not have "exclusive authority." On review, the Third Circuit acknowledged that, when faced with "two statutes that are in apparent

conflict," the duty of the court is to harmonize them if it can. *Id.* The court, however, was unable to agree with the FLRA's reading of the Technician Act, inasmuch as the subject matter of the union's proposals was "explicitly committed to the discretion of the adjutant general" by that Act. *Id.* at 280. Therefore, it noted, the FLRA's "accommodation" was "no accommodation at all; rather, it is a negation of the Technician Act." *Id.* at 282.

Having found that there was indeed a conflict between the two statutes, the court went on to consider "whether Congress intended the specific provisions of the 1968 Technician Act or the more general provisions of the 1978 [Federal Labor Act] to govern" the resolution of the case. *Id.* at 283. After considering "the language of the statutes themselves, the legislative history underlying each Act, and the apparent or inferable purposes that each Act reflects," *id.*, the court determined that the terms of the Technician Act had continuing vitality despite the contrary provision of the Federal Labor Act, and reversed the FLRA's order to bargain. "To do otherwise," it concluded, "would permit a subtle subversion of a clear congressional intent." *Id.* at 286.

Our first task, then, is to determine whether, as the Guard argues, the Technician Act—disregarding for the moment the effect of the Schedules Act—grants the Secretary of the Army unfettered discretion to establish the work hours of National Guard technicians. If, as the FLRA contends, it does not, then there is no conflict between the statutes, and no plausible argument for excepting the Guard from the bargaining requirement of the Schedules Act.

1. Grant of Discretion Under the Technician Act

■ Section 709(g)(2) of the Technician Act, in relevant part, provides:

Notwithstanding sections 5544(a) and 6101(a) of title 5 *or any other provision of law,* the Secretary concerned *may ...* prescribe the hours of duty for techni-

cians. Notwithstanding section 5542 and 5543 of title 5 *or any other provision of law,* such technicians *shall* be granted an amount of compensatory time off from their scheduled tour of duty equal to the amount of any time spent by them in irregular or overtime work, and *shall not* be entitled to compensation for such work.

(Emphases added.) Not surprisingly, the parties would have us focus on different portions of this provision. The Guard repeatedly directs our attention to the prosaic "[n]otwithstanding ... any other provision of law." Meanwhile, the FLRA finds significance in the mosaic of "may" and "shall": although technicians *shall* be granted compensatory time off and *shall not* be paid a premium for overtime, the statute provides only that the Secretary *may,* not that he *shall,* prescribe the hours of duty for technicians. According to the FLRA, this distinction means that the Secretary's authority to prescribe work schedules is "discretionary" rather than "mandatory"; and because the Guard "is obligated to bargain to the extent of its discretion," it argues, the work schedule proposals are negotiable. It also contends that the distinction between "may" and "shall" distinguishes this case from *New Jersey Guard,* and from *Wright v. Alabama Army National Guard,* 437 F.Supp. 54 (M.D.Ala. 1977), *aff'd,* 605 F.2d 943 (5th Cir.1979) (on the basis of the district court's decision).

In *Wright,* the court held that although the Technician Act predated Public Law 93–259, which brought the Guard within the definitional coverage of the Fair Labor Standards Act (FLSA), it continued to exempt the Guard from the overtime pay provisions of the FLSA. As the FLRA correctly points out, in *Wright,* the relevant statutory language provided that "notwithstanding ... any other provision of law," technicians *"shall not* be entitled" to overtime pay. In *New Jersey Guard,* however, in finding that the union's proposals would impinge upon the discretion vested in the state adjutant general by the Technician Act, the court relied on two of the Act's provisions: section 709(e)(3), which provides that, notwithstanding any

**1402**

other provision of law, the state adjutant general *"may"* discharge any technician for cause; and section 709(e)(5), which provides (again, "notwithstanding any other provision of law") that any appeal from such a discharge *"shall not* extend beyond the adjutant general." 677 F.2d at 280. The court in that case did not distinguish between the "discretionary" and the "mandatory" language, however. Nor do we in this one; it is a distinction in search of significance.

The question, at this point in our analysis, is not whether the Secretary's authority under the Technician Act is mandatory or discretionary, but whether that Act, standing alone, commits decisions regarding technicians' work schedules to the Secretary's unfettered discretion. We believe that it does. The Act requires the Secretary to grant compensatory time for overtime work, prohibits him from paying overtime pay, and allows him to "prescribe the hours of duty for technicians," all "notwithstanding any other provision of law." Clearly, the Technician Act does not *require* him unilaterally to prescribe work schedules. Because the Guard was never bound by the workday and workweek limitations in section 6101, the Secretary (or those to whom he delegated his authority under the Act) presumably could have bargained over hours of work even before the enactment of the Schedules Act. That choice, however, notwithstanding any other provision of law, is his alone.

Although the "notwithstanding" language of the statute really could not be clearer, we stoop to note that our view of section 709(g) also finds support in the legislative history of the Technician Act. The House committee report on the bill states:

> This bill provides that the Secretary ... may prescribe the hours of duty for all technicians.... This authority will continue the existing practice regarding hours of work and compensatory time off. It is the firm view of the committee that the irregular hours of work to which technicians are subjected on frequent occasions make it impractical, both from the standpoint of the Government and

the individual, to be limited to the normal provisions regarding a straight 40–hour week with overtime or differential pay for additional hours of work. The frequent irregular hours are inherent in the technician job and position.

H.R.Rep. No. 1823, 90th Cong., 2d Sess. 13, *reprinted in* 1968 U.S.Code Cong. & Admin.News, 3318, 3336. Thus, Congress recognized that the very nature of the technicians' job, with their dual civilian and military responsibilities, often requires that they be "subjected" to irregular work hours. The Technician Act therefore authorizes the Secretary of the Army to "prescribe" their hours of duty "notwithstanding ... any other provision of law."

In the face of the statute and its legislative history, the FLRA says: "Read in context, the reference to 'any other laws' concerns laws of the same sort, i.e., laws which would restrict the agency from prescribing hours other than the standard schedule of five 8–hour days." Otherwise, it argues, the references to specific statutory provisions would be superfluous. While it is not clear to us that the Schedules Act would not in any event be a law "of the same sort," we decline the FLRA's creative invitation to limit the unambiguous language of the statute.

### 2. Resolution of Conflicting Statutory Provisions

Since, as an initial matter, section 709(g) of the Technician Act committed the establishment of work schedules to the unfettered discretion of the Secretary, the next question is whether that provision was implicitly repealed or confined by the subsequent enactment of the Schedules Act, which requires bargaining over work schedules. In other words, having found that there is indeed a conflict between the two statutes, we must decide "whether Congress intended the specific provisions of the 1968 Technician Act or the more general provisions of the [1982 Schedules Act] to govern" its resolution. *New Jersey Guard,* 677 F.2d at 283; *see also Colorado Nurses,* at 1488.

At this stage of our analysis, we return again to the reasoning of the court in *New Jersey Guard:*

Looking first to the statutory language, we immediately confront the preface to section 709(e) of the Technician Act, which explicitly provides that its terms apply *"Notwithstanding any other provision of law ..."* [emphasis added]. A clearer statement is difficult to imagine: section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted. Application of this statement is less certain, however, with respect to a statute such as the Labor–Management Act, adopted *after* the Technician Act. The drafters of section 709(e) can hardly be said to have had the Labor–Management Act specifically within their contemplation. Even so, the preemptive language is powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority of the state adjutants general as set out in the Technician Act. The language does not preclude a subsequent change of heart on the part of Congress, but it does suggest that any qualification of the terms of section 709(e) would be accepted by Congress only after some consideration of the factors requiring or permitting such a change.

677 F.2d at 283. Clearly, the Third Circuit's reasoning is equally applicable to this case; we need only to substitute "section 709(g)" for "section 709(e)," "Schedules Act" for "Labor–Management Act," and the "Secretary of the Army" for the "state adjutants general," and our position in this case is identical.

We turn, therefore, to determine whether there is evidence that Congress specifically considered the possibility, in the Schedules Act, of curtailing the Secretary's discretion, under the Technician Act, over the work schedules of Guard technicians. The most persuasive evidence that it did is found in the definition section of the later statute. Although the Schedules Act itself does not specifically define the term employee, it adopts by reference the general definition of "employee" in section 2105 of title 5, which provides:

(a) For the purpose of this title, "employee", except as otherwise provided by this section or when specifically modified, means ... an individual who is—

(1) appointed in the civil service by one of the following acting in an official capacity—

. . . .

(F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32 [the Technician Act].

In this case, then, as in *New Jersey Guard* and *Wright*, National Guard technicians come within the definition of a subsequently enacted statute that appears to conflict with the Technician Act.

In *New Jersey Guard*, the conflict was with the Federal Labor Act, which extends, as we have seen, to employees of "Executive agenc[ies]." 5 U.S.C. § 7103(a)(2)–(3). The Technician Act establishes Guard technicians as employees of the Departments of the Army and the Air Force, firmly within the Executive Branch. *See* U.S. Const. art. II, § 2, cl. 1; *New Jersey Guard*, 677 F.2d at 281 n. 5. Although the Federal Labor Act exempts several named agencies, not including the Guard, the court held that insofar as it conflicted with the Technician Act, the Federal Labor Act implicitly exempted the Guard from its coverage. In *Wright*, the conflict was with the FLSA, which was amended in 1974 specifically to cover "any individual employed ... as a civilian in the military departments." The court, still, was not persuaded that Congress had intended implicitly to repeal the inconsistent provision of the Technician Act.

To be sure, the definition in this case is arguably a better indicator of Congress's specific intent, inasmuch as it makes an express reference to the Technician Act. The reference, however, is indirect, if not oblique: the Schedules Act itself refers only to the broad, general definition of employee in title 5, which in turn refers to persons appointed by "an adjutant general

designated by the Secretary concerned under section 709(c) of title 32." We recognize that the legal effect of a provision incorporated by reference ordinarily is no different from that of a provision actually set forth in a statute. Here, however, we are looking for an indication that Congress had the National Guard in contemplation when it enacted the Schedules Act; and the incorporation of Guard technicians by a reference once removed is simply less telling evidence that Congress considered the Guard's unique situation than would be a specific inclusion of technicians *eo nomine* in the Schedules Act itself.

In addition to the conflict between section 709(g) of the Technician Act and the bargaining requirement of the Schedules Act, there is a second inconsistency between the two statutes suggesting that Congress did not have the Guard in mind when it enacted the Schedules Act. As we have mentioned, section 709(g) of the Technician Act clearly prohibits the Secretary from paying a premium to Guard technicians for overtime work. With equal clarity, however, the Schedules Act establishes methods for computing premium pay for employees working under alternative work schedules, 5 U.S.C. §§ 6123, 6128, and prohibits agencies from agreeing to an alternative work schedule program "which contains premium pay provisions which are inconsistent with [the method set forth in the Schedules Act]." *Id.* at § 6130(b). Thus, if the Guard establishes an alternative work schedule through collective bar-

gaining, and pays overtime compensation to employees working under that schedule, it violates the clear command of the Technician Act; if it establishes an alternative work schedule but, absent an employee's request for compensatory time off in lieu of payment, *see* 5 U.S.C. § 5543, does not pay such compensation, it violates the equally clear command of the Schedules Act. We need not decide today, of course, which of the two provisions would be controlling.[1] Rather, the point is only that such an evident contradiction strongly suggests that Congress did not specifically consider the Technician Act, and the unusual employment status of Guard technicians, when it enacted the Schedules Act.

Moreover, neither the FLRA nor the intervenor has directed us to anything counter-indicative in the legislative history of the Schedules Act.[2] Borrowing and again adapting the language of *New Jersey Guard*, "[t]here is no reference to the unique state-federal status of those employees; no recognition of any military aspects to the employment of National Guard technicians. In short, we can find no evidence whatsoever that Congress ... had within its contemplation the employment status of National Guard technicians [when it enacted the Schedules Act]." 677 F.2d at 285.

Therefore, the FLRA "encounter[s] head-on the 'cardinal rule ... that repeals by implication are not favored.'" *Morton v.*

---

1. Pointing to the two inconsistencies between the Schedules Act and the Technician Act, the Guard contends that it is exempt from the Schedules Act altogether. The only issue before us in this case, however, is whether the Guard is subject to the bargaining requirement of the Schedules Act, and that is the only issue we decide in this case.

2. Both the FLRA and the Intervenor do point to a separate bill relating to membership of military personnel in labor organizations that was before Congress in 1978 (the same year the initial version of the Schedules Act was enacted) as evidence that "Congress was specifically aware of issues concerning the labor relations status of technicians" while it was considering the Schedules Act. The Senate version of the bill would have denied technicians the right to collective bargaining altogether. After discus-

sion in committee, however, that portion of the bill was rejected. H.R.Rep. No. 894, Part 2, 95th Cong., 2d Sess. 7, *reprinted in* 1978 U.S. Code Cong. & Admin.News 7575, 7590. *See also* 10 U.S.C. § 976 (1982).

This evidence ill-serves the FLRA in this case, however. As the court in *New Jersey Guard* noted, the legislative history of that bill

provides an example of the attention that one would expect to find if Congress had intended to modify the provisions of the Technician Act. The history of the military labor organization bill constitutes additional evidence that Congress, even in 1978, considered the status of National Guard technicians to be of sufficient consequence to merit discussion and careful consideration before being modified.

677 F.2d at 285 n. 8.

*Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (quoting *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)). The force of this rule is greater still when it is urged that a specific statute has been repealed by a later but more general one. *See Colorado Nurses* at 1491. For, as the Supreme Court stated in *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 868, 6 L.Ed.2d 72 (1961) (quoting *Townsend v. Little,* 109 U.S. 504, 512, 3 S.Ct. 357, 362, 27 L.Ed. 1012 (1883)), "it is familiar law that a specific statute controls over a general one 'without regard to priority of enactment.'" The Third Circuit applied this principle to the facts in *New Jersey Guard* as follows:

> Congress in 1968 [in the Technician Act] turned its attention to the very class of federal employees involved in this dispute. It crafted with care precise provisions intended to meet concerns of federalism and military control that are duplicated nowhere else in the federal service.... One can only infer from this narrowly directed activity that Congress, upon consideration of the issue in dispute here ... decided that very matter, with explicit and specific language, in 1968. Turning to the [later] legislation, we are met with a statute addressing the employment concerns of all federal employees.... It appears inconceivable that Congress ... without a moment's thought as to the question of state control over the National Guard, or as to the needs of military discipline over Guard technicians in their dual status as civilian and military personnel, intended to eliminate, by mere implication, the controls that Congress carefully had imposed over those employees ... years earlier.

677 F.2d at 285–86; *see also AFGE Local 2953,* 730 F.2d at 1546–47.

Faced, as we are, with two conflicting statutes, we must do our best to harmonize them. Here, that harmony can be achieved only by reading the Technician Act as preserving a narrow exception to the broadly applicable bargaining requirement of the Schedules Act.[3]

### III. Conclusion

Section 709(g) of the Technician Act, when it was enacted in 1968, gave the Secretary of the Army unfettered discretion to "prescribe the hours of duty" for National Guard technicians. Because we are unable to find any indication in the Schedules Act that Congress intended to limit that discretion, we cannot conclude that the bargaining requirement of the later statute implicitly amends or repeals the earlier enactment. Accordingly, the petitions for review are granted, and the cross-petitions for enforcement are denied.

*So Ordered.*

---

3. Because we find that, notwithstanding the Schedules Act, the Technician Act continues to commit the establishment of technicians' work schedules to the discretion of the Secretary, we need not address the Guard's alternative argument that the FLRA improperly refused to consider its negotiability objections under the management rights and compelling need sections of the Federal Labor Act.